**ZEMON CONCRETE CORPORATION, Petitioner,**

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION, Respondent.**

**Ray Marshall, Secretary of Labor, Co-Respondent.**

**No. 79–1793.**

United States Court of Appeals, Seventh Circuit.

Submitted May 11, 1982.*

Decided June 2, 1982.**

---

\* This case originally was set for argument but, thereafter, Petitioner's motion to waive oral argument was granted. Consequently, this case is submitted for decision on the briefs and the record. *See* Fed.R.App.P. 34(f); Circuit Rule 14(e).

\*\* This opinion was originally decided by order of the court dated June 2, 1982. *See* Circuit Rule 35. The court has subsequently issued it as an opinion.

Allen H. Meyer, Chicago, Ill., for petitioner.

Allen H. Feldman, Dept. of Labor, Washington, D. C., for respondent.

Before CUMMINGS, Chief Judge, and PELL and BAUER, Circuit Judges.

PER CURIAM.

Under 29 U.S.C. § 660(a), Zemon Concrete Corp. ("Zemon") petitions for review of an order of the Occupational Safety and Health Review Commission ("OSHRC"). The ALJ upheld citations for one serious violation and six non-serious violations of Occupational Safety and Health Act ("OSHA") standards.[1] The ALJ's decision

1. A serious violation exists when there is a substantial probability that death or serious physical harm could result from the violative condition. A penalty of up to $1,000 is mandated. All other violations are non-serious, and a penalty of up to $1,000 may be assessed. The ALJ found Zemon had seriously violated the floor openings standard, 29 C.F.R. § 1926.-

became a final OSHRC order when no Commissioner ordered discretionary review of it. *See* 29 U.S.C. § 661(i).

## I.

A subcontractor, Zemon was contractually obligated to perform the concrete work for an eight-story office building being constructed in Schaumburg, Illinois. After an OSHA compliance officer's inspection, the general contractor and all subcontractors received two citations for violations of OSHA standards.

One citation, labeled "serious," included two violations; the other included eight "non-serious" violations. As set forth in note 1, *supra*, the ALJ upheld one "serious" violation for failing to comply with the "floor openings" standard, which requires standard railings on all sides of a floor opening.[2] The ALJ also upheld six "non-serious" violations. The violations and the factual bases for them are: (1) "fire protection" standards—no fire alarm system and welding equipment near combustible material; (2) "ladderway floor opening" standard—removal from three sides of movable barricades provided for a three foot by three foot roof opening, exposing Zemon

employees to a possible twelve foot fall; (3) failure to guard or cover floor holes—Zemon employees on two floors worked near uncovered holes as large as twelve inches in diameter; (4) failure to provide stair railings;[3] and (5) failure to fill hollow metal pantype treads with concrete or temporary wooden planks.[4]

## II.

### A.

As both parties apparently agree, *Anning-Johnson v. OSHRC*, 516 F.2d 1081 (7th Cir. 1975), controls our disposition of the liability issues presented in the instant case. Zemon also apparently concedes, as it must, that nothing in *Anning-Johnson* explicitly precludes its liability for the "serious" violation at issue here.[5] Rather, Zemon contends that we should extend the *Anning-Johnson* rule to "serious" violations because the distinction between "serious" and "non-serious" violations is arbitrary, claiming that the "serious" violation found in the instant case was labeled "non-serious" in *Anning-Johnson*. We decline to extend *Anning-Johnson* to preclude Zemon's liability for the "serious" violation at issue here for the following reasons.

500(b)(1), and non-seriously violated two fire protection standards, 29 C.F.R. § 1926.-150(c)(1)(iv) and .150(c)(1), the ladderway floor opening standard, 29 C.F.R. § 1926.500(b)(2), the floor hole standard, 29 C.F.R. § 1926.-500(b)(8), and two stairway standards, 29 C.F.R. § 1926.500(e)(1)(iii) and .501(f).

The "serious" citation originally was for violation of the open-sided floor standard. Zemon argues that this standard is inapplicable because Zemon's employees were working on the roof, and the open-sided floor standard does not apply to flat roofs. *See Langer Roofing & Sheet Metal, Inc. v. Secretary of Labor*, 524 F.2d 1337 (7th Cir. 1975). Although this is true, the ALJ amended the citation from the open-sided floor standard to the more appropriate floor opening standard, which requires the same protective railing but is "invulnerable to the 'a-roof-is-not-a-floor' attack."

2. Zemon employees were walking within ten feet, and working within twenty feet, of an eighth floor elevator shaft that was unguarded on one side. Sufficient evidence supports the ALJ's finding that this violation exposed Zemon employees to a possible fall of ninety-six feet because a worker falling from the eighth

floor might have fallen the entire length of the elevator shaft. The scaffolding on the seventh floor, which Zemon contends would have stopped a fall, already had been removed when the inspector found the "serious" violation on the eighth floor. Thus, this violation should not have been labeled "non-serious," as Zemon argues.

3. The stairs were open on both sides, except the next flight of stairs was immediately adjacent to one side of each flight.

4. Zemon was contractually responsible for filling the treads with concrete, although doing so would have impeded the project because all workers used the stairs. However, the treads could have been filled with temporary wooden planks.

5. In explaining the scope of its holding, the *Anning-Johnson* court stated: "[W]e have not held that the Secretary's policy of imposing liability on employers for exposure to conditions that are serious violations of promulgated standards is invalid." 516 F.2d at 1091.

■ The compliance officer testified that in determining whether the fall hazard was serious—that is, whether the violative condition caused a substantial possibility of death or serious physical harm, 29 U.S.C. § 666(j)—he considered the possible fall distance, the surface below, and the type of injury that most likely would result from a fall. Substantial evidence supports the ALJ's finding that Zemon employees were exposed to a potential fall of ninety-six feet down an elevator shaft. *See* note 2, *supra.* Thus, the "serious" violation at issue here satisfied the statutory criteria.

Nor was the labeling decision arbitrary. Contrary to Zemon's contention, the "fall hazard" violation deemed "non-serious" in *Anning-Johnson* was materially different from the "fall hazard" deemed "serious" in the instant case. The subcontractor in *Anning-Johnson* was cited for technically im-

proper perimeter guards around an elevator shaft,[6] while in the instant case there simply was no protection from falling through sections of the elevator shaft.[7]

Zemon also argues that the "other" violations in this case could just as well have been labeled "serious," again contending that the distinction is arbitrary.[8] With respect to the stairways, Zemon claims there was testimony that a worker could fall more than one floor, in which case the injury could be serious. In fact, the testimony to which Zemon refers was that a worker could only fall one floor, or a maximum of ten feet. The ladderway fall distance was also too short to be fatal or serious.[9] The floor holes were too small to be fallen through. Although the combustible material which was present created a fire hazard, it did not pose the risk of a serious fire.

Finally, Zemon argues that it should not have been cited since it took a realistic alternative to literal compliance, indeed, the ultimate alternative, when its employees walked off the job. This occurred the day after the inspection and lasted a few days. According to the construction superintendent, ironworkers were bringing beams up over the heads of Zemon employees, and setting them on the roof. Several of Zemon's forms were crushed by the beams. The superintendent said, "Someone had to yield. Zemon left." First, what occurred after the inspection is not relevant to the citations. Moreover, Zemon's leaving appears to have had nothing to do with the safety violations for which Zemon was cited.

6. On the fifth floor of the shaft a single wood rail, without intermediate rail or toeboard, guarded the opening. On the third floor the opening was covered by unsecured plywood. In *Anning-Johnson* there was also an open sided floor violation, again a technical violation. However, around each floor was a single, tautly strung, steel cable. 516 F.2d at 1082–83. Thus, in *Anning-Johnson* the fall distance was shorter than in this case. Moreover, unlike this case, the open areas had some perimeter guards.

7. Zemon argues that according to *Anning-Johnson* a contractor is not responsible for a violation if it takes realistic measures and makes reasonable efforts to protect employees when literal compliance is impossible. Zemon claims that it had to remove barricades from the elevator shaft in order to work on the edge, noting that in *American Crane Co.,* 1976–77 CCH OSHD ¶ 21,337, a citation was vacated when compliance was impossible. Indeed, compliance was impossible when Zemon was working on the edge of the shaft. Consequently, the first item of the serious citation was vacated. The ALJ upheld only the second item of the "serious" citation, concerning the hazard to employees working ten feet from the shaft, not those working on the edge. Because the rails did not have to be removed for those workers, compliance was not impossible.

Zemon adds that safety belts would have been impossible, or, if possible, might have increased the hazard. However, this alternative to literal compliance was suggested only for the first item. Consequently, it is irrelevant to the second.

8. The second citation was labeled "other." Zemon contends that the label deprived it of notice of the nature of the charges, and of how to defend against them. This argument requires little discussion. "Serious" and "non-serious" are mutually exclusive and exhaustive of the field of possible charges. Any charge which is "other" than serious, therefore, must be "non-serious." Moreover, Zemon has failed to show any prejudice resulting from the citation having been labeled "other" rather than "non-serious."

9. There have been OSHRC cases in which a ten to fifteen foot fall was considered serious, but the probability of serious injury in those cases was increased by the presence of some protruding objects on the surface below. *E.g., Schiavone Construction Co.,* 5 BNA OSHC 1385 (1977); *PPG Industries, Inc.,* 6 BNA OSHC 1050 (1977).

## B.

■ We also uphold the citations for the "non-serious" violations. Under *Anning-Johnson*, a subcontractor at a multi-employer construction site may be held liable for "non-serious" violations for which the subcontractor is jointly responsible, which the subcontractor is created, or for which the subcontractor is otherwise responsible. However, a subcontractor may not be held liable merely because its employees were exposed to conditions constituting "non-serious" violations which the subcontractor "neither created, caused, nor [was] otherwise responsible for ...." 516 F.2d at 1091. Liability for the "non-serious" violations at issue in the instant case was not imposed merely because Zemon's employees were exposed to them.[10]

■ With respect to the "guardrail" violation, the record reveals that, after Zemon complained, the general contractor furnished movable barricades which Zemon employees removed to perform their work. However, the barricades were not always replaced immediately after the work requiring their removal was completed. Yet, even the contract required such replacement "as soon as possible, but in any event, not later than the end of each working day." [11] Thus, contrary to its assertion, Zemon did not make reasonable efforts to protect its employees from the hazards resulting from the lack of proper barricades.[12]

The record also supports the ALJ's determinations with respect to the other "non-serious" violations. For example, the ALJ found that Zemon could have caused the installation of fire protection equipment and that correction of the "fire hazard" violation was not "an esoteric matter requiring special skill or knowledge, nor [did] it fall within the purview of a particular craft jurisdiction."[13] Zemon also could have covered the floor holes and corrected the stairway violations. Zemon employees constructed wood framework with tools and materials which could have been used for temporary stair railings and pan fillings, and to cover the floor holes.[14]

Zemon also argues that if it had undertaken to perform the required corrective work, it would have violated union agreements. However, at least with respect to covering the floor holes, Zemon feared no craft-jurisdiction disputes, and correction of this violation was not outside Zemon's area of expertise. Indeed, Zemon employees had covered some of the holes.[15] Alternatively,

---

10. Zemon argues that it may not be held liable for "non-serious" violative conditions with respect to which it had no contractual obligation. However, contract provisions do not govern enforcement of the Act. *Central Georgia R. R. v. OSHRC*, 576 F.2d 620 (5th Cir. 1978).

11. Zemon relies on this contract language. As stated in note 10, *supra*, the contract does not govern enforcement of the Act. Moreover, as we read the above-quoted contract provision, Zemon was required to replace the barriers "as soon as possible" but, at least no later "than the end of each working day." Thus, where, as here, replacement before the end of a work day was feasible such replacement was required by the contract.

12. The record also reveals that the general contractor regularly inspected the site to see that the movable barricades it had supplied were in place. After one such inspection, the general contractor wrote to Zemon to remind it to replace the barricades. Thus, the general contractor fulfilled its contractual obligations.

13. Zemon argues that there was no hazard to employees since the amount of combustible material was minimal, and in case of fire, escape would be unimpeded. The latter argument was found to be without merit by the ALJ, and Zemon has not shown that conclusion to have been insufficiently supported. The former contention merely supports deeming the violation "non-serious."

14. Zemon suggests that the stairs, even with the violations, were less dangerous than the ladders which employees were supposed to use, and that the pan-treads were eventually filled with ill-fitting planks which made the stairs as dangerous as before they were filled. However, the citation concerned the dangerous stairs, not the unused ladders. If the planks installed were not the right size, the solution, as the ALJ pointed out, was to install properly fitted planking, not to "discard a safety standard simply because its implementation ... was less than adequate."

15. Zemon's argument that it would have been unreasonable to follow another contractor, to fill the holes it made, ignores the hazard evident in an exhibit which shows a Zemon em-

if Zemon was justifiably worried about breaking union agreements because it lacked craft jurisdiction, it should have requested·the general contractor to direct the carpenters to install the required items.

Finally, Zemon argues that it registered complaints with the construction superintendent and warned its employees during safety meetings to take care when working near hazards. However, the ALJ found that these complaints were no more than perfunctory, and fell "short of the corrective steps required of an employer under the Act." Because Zemon's complaints caused the general contractor to install movable barricades around the elevator shaftway, a similar effort on Zemon's part presumably would have caused the general contractor to abate the remaining violations.

In conclusion, the ALJ found that Zemon was aware of the obvious hazards and had the ability, both practically and legally, either to correct the violations itself or to demand that they be corrected. The ALJ considered Zemon's exculpatory arguments for each "non-serious" violation and found in each instance that correction was achievable. Thus, the ALJ properly held Zemon liable for the "non-serious" violations which it either created or controlled.

### III.

The Act gives the Commission authority to assess penalties "giving due consideration to the appropriateness of the penalty with respect to the size of the business of the employer being charged, the gravity of the violation, the good faith of the employer, and the history of previous violations." 29 U.S.C. § 666(i). The Secretary has set

forth in his Compliance Operations Manual standard percentages of reduction for each of the statutory factors. The compliance officer gave Zemon the standard reduction of 20% each for size and good faith, and 0% reduction for history. Zemon argues that its good faith was not given due consideration, claiming that its good faith compliance efforts should have merited a 100% reduction and resulted in no assessed penalty in spite of the proposed penalty for gravity. Because a penalty cannot be reduced to zero, Zemon contends the Secretary's standard reductions are arbitrary and unreasonable.

The reduction of 20% for good faith is neither arbitrary nor unreasonable. The Secretary has broad discretion to fix penalties for OSHA violations. His determination that standard reductions shall be less than 100% reflects an adherence to the intent of the Act, which is to encourage employers to provide a safe workplace. If, as Zemon suggests, a 100% reduction was permitted for any one statutory factor, the purpose of the Act would be frustrated. For example, if an employer is cited for a violation whose gravity merits some penalty, or if the employer has a history of violations, then the protective purpose of the Act demands that the penalty not be reducible by 100%, even if the employer has shown good faith. The Secretary's determination that the standard reduction for good faith will be 20% is thus reasonable and consistent with the Act.[16]

Thus, the determinative question is whether the ALJ abused his discretion. Zemon has not shown such an abuse of discretion. The decision shows that the statutory criteria were taken into account.[17]

---

ployee bent over working with his back to a hole that is only inches away. It was not unreasonable to expect Zemon employees to cover holes in the area in which they were working.

**16.** Zemon's claim that the Secretary's 20% standard reduction creates an impermissible "irrebuttable presumption" is without merit. An employer is not denied the opportunity to present evidence relevant to the proposed penalty by the Secretary's policy. Rather, the poli-

cy merely sets an upper limit on the reduction allowed when the employer meets any of the four statutory conditions.

**17.** The ALJ found that the proposed sixty dollar penalties for four of the "non-serious" violations reasonably reflected a proper consideration of the statutory criteria. He also reduced the proposed penalty for the "serious" violation from $360 to $200. Some penalty is mandated for a "serious" violation, § 666(b), but the gravity of this violation was moderate because

Because Zemon was entitled to no discount for history of violations, there was no reason to reduce the penalties for the "non-serious" violations to zero. The "serious" violation required some penalty, and we must defer to the ALJ's decision that the gravity and the mitigating factors warrant a $200 penalty.

### IV.

Substantial evidence supports finding Zemon liable for both the "serious" and the "non-serious" violations, and liability properly was imposed under *Anning-Johnson.* The penalties assessed also were lawful. Consequently, the OSHRC order is Affirmed.

of the duration of the risk, the number of employees exposed, and their proximity to the danger zone.